IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DARREN BANNING,

    Petitioner,

v.                                   Civil Action No. **3:08CV651**

GENE M. JOHNSON,

    Respondent.

## MEMORANDUM OPINION

Darren Banning, a Virginia state prisoner represented by counsel, brings this petition for a writ of habeas corpus challenging his convictions in the Circuit Court for the County of Henrico (the "Circuit Court") for first degree murder of his wife, Lee Banning (hereinafter "Lee") and the use of a firearm during the commission of that crime.

## I. BANNING'S CLAIMS FOR FEDERAL HABEAS CORPUS RELIEF

Banning contends that he was denied the effective assistance of counsel and is entitled to relief on the following grounds:

A.    Counsel failed to timely and properly object to the testimony from Detective Sullivan and Lieutenant Pajic that Lee's death was not caused by hunting accident.

B.    Counsel failed to call Sarah Banning (Banning's daughter) as a witness.

C.    Counsel failed to call Banning's neighbors, Mr. and Mrs. Royal, as witnesses.

D.    (1) Counsel failed to call witnesses to testify that hunters in the area of the murder often consume alcohol.

(2)   Counsel failed to suggest to the jury that Richard Thurston's prior affair with Andrea Mowels caused him to be biased against Mr. Banning.

(3)   Counsel failed to present evidence demonstrating the significant lapse of time before Sergeant Englehart came forward and stated he remembered hearing a shot gun blast at 7:30 a.m. on the morning of the murder.

(4)   Counsel failed to object to evidence pertaining to experiments regarding the firing of shotguns around the scene of the murder and the witnesses' declarations that the shot they heard on the morning of the murder came from the same distance and direction.

(5)   Counsel failed to present evidence that police had not attempted to ascertain the time of death by body temperature, rigor mortis, livor mortis, or postmortem lividity.

(6)   Counsel failed to request a jury instruction informing the jury it was not necessary for the defense to prove beyond a reasonable doubt that Lee was killed as a result of a hunting accident.

E.   Counsel failed to present evidence or argument to suggest that Lee had been shot from the tree house.

F.   The cumulative effect of counsel's errors denied Banning the effective assistance of counsel.

## II. THE APPLICABLE SUBSTANTIVE AND PROCEDURAL CONSTRAINTS UPON FEDERAL HABEAS CORPUS REVIEW

This Court's authority to grant habeas relief corpus is governed by 28 U.S.C. §§ 2254(d) and 2254(e)(1). Under Section 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). A petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. Under 28

2

U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has emphasized that this standard requires federal habeas petitioners to demonstrate not only that the state court's decision was erroneous or incorrect, but also that it was unreasonable.  See Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

Banning presented each of these claims to the Circuit Court in a state habeas application.  The Circuit Court denied Banning's petition for a writ of habeas corpus in a detailed opinion. Thereafter, Supreme Court of Virginia, by summary order, denied Banning's petition for appeal.  Although the Supreme Court of Virginia did not render an opinion, the Circuit Court's decision and factual findings are entitled to deference.  See McHone v. Polk, 392 F.3d 691, 704 n.5 (4th Cir. 2004); Fisher v. Lee, 215 F.3d 438, 445-46 (4th Cir. 2000).

### III.   SUMMARY OF THE EVIDENCE

In rejecting Banning's petition for a writ of habeas corpus, the Circuit Court aptly summarized the evidence of Banning's guilt as follows:

> On December 23, 1999, two local hunters, Shirley W. Englehart (a veteran police officer in Henrico County) and Sandra Hottinger, were both out hunting in the woods near their homes. (Tr. 430, 470). At precisely 7:30 a.m. Englehart heard a shotgun blast coming from the direction of Harewood Lane and the residence of Darren and Lee Banning (the petitioner and the victim, respectively). (Tr. 434). Englehart testified that in the thirty years he hunted in the area, never before had he heard a shot coming from that particular direction. (Tr. 434-35).
>
> Sandra Hottinger also recalled hearing a shotgun blast between 7:30 a.m. and 8:00 a.m. on that morning from the same location. (Tr. 454). She too recalled that in all the years she had regularly hunted in those woods, she had never before heard a blast coming from the direction of the Banning residence. (Tr. 456).
>
> Counsel stipulated that sunrise is at 7:22 a.m. on December 23rd every year. (Tr. 577). Both Englehart and Hottinger noted that visibility at 7:30 a.m. was actually quite good, and one could see for 50 to 60 yards. (Tr. 434, 455).
>
> Mr. Banning told police investigators that he left for his work at Unisource, Inc., on the morning of December 23, 1999 at roughly 7:10 a.m. (Tr. 662). Despite the fact that it was only 20.2 miles from the Banning residence at 7700 Harewood Lane to Unisource's location at 2401 Dabney Road, a roughly 19 minute drive, Banning was not seen at work that morning until nearly an hour later, at 8:10 a.m. (Tr. 686, 736). Banning and Richard Thompson, a co-worker at Unisource, alternated early morning shifts, so Thompson was surprised to see Banning in so early when it was Banning's day to come in late. (Tr. 751). Thompson testified that Banning was not due in to work that morning until at least 10:00 a.m. (Tr. 751).
>
> Banning told Thompson that he had spoken to Lee Banning, his wife, at 7:34 a.m. on his cell phone and that he had been in the vicinity of I-95 and I-64 at the time of the call. (Tr. 755). Banning informed Bill

4

Mastink, another co-worker, that he had a conversation with Lee at 7:43 a.m. (Tr. 738).[1] As with Thompson, Banning pointed out that he had been in the vicinity of I-95 and I-64 at the time of his wife's call. (Tr. 738).

Lee Banning was employed by Dr. John F. Monacell, DOS. Workdays at Dr. Monacell's office began at 9:00 a.m. (Tr. 826-828).

Sharon Rowsey, a co-worker, friend, and nearby neighbor of Lee's, became worried when Lee did not show up to work on the morning of December 23rd. (Tr. 828). Lee had always been "very prompt." (Tr. 838). According to Mrs. Rowsey it was "so unlike her not to be there, not to have called, not to have told anyone." (Tr. 830). At 10:30 a.m., Mrs. Rowsey finally received a phone call from Mr. Banning. Banning told her that he had received a phone call from Lee at 7:30 a.m. but he was already busy at work and had not been able to talk to his wife then. (Tr. 832). Banning also told her that he had just spoken to Lee and that she had mentioned going Christmas shopping. (Tr. 831). Mr. Banning asked, "isn't today a 'no-patient day'?" Banning told Mrs. Rowsey that perhaps Lee had gotten her calendar confused. Rowsey testified that such behavior was completely out of character for Mrs. Banning. (Tr. 831-32).

At 11:00 a.m., Mr. Banning phoned Mrs. Rowsey again to notify her that he had arrived home to find his wife's van moved from its normal spot. (Tr. 835). He told her that his younger daughter Annie's cat had recently had kittens and "maybe because of the position of the van" Lee had seen the cat and gone off into the woods to look for it. (Tr. 835).[2]

At Sharon's request, her husband, Greg Rowsey, went over to the Banning residence between 11:00 and 11:30 a.m. (Tr. 834, 847). When he arrived, he noticed that the windows on Lee's van were "all frozen and iced up." (Tr. 849). According to Mr. Rowsey's testimony, there was "ice and dew all over the windows" such that Lee's

---

[1] The Commonwealth argued at trial that these very detailed accounts of times by the petitioner were probative of his guilt.

[2] The Commonwealth undermined this theory (that Lee had spotted kittens while en route to work) by showing that the victim was not clothed in her work uniform at the time of her death. (Tr. 839-841) Furthermore, Lee died at about 7:30 a.m., but was not due at work (located a short distance from her house) until 9 a.m. (Tr. 828).

van was not drivable in that condition.  (Tr. 849).  He also noted that there was no evidence whatsoever that the van had been moved that day.  (Tr. 849).

Mr. Rowsey went around the side of the Banning residence towards the back porch.  He heard someone laughing.  (Tr. 850).  When he rounded the corner of the home, he saw Mr. Banning standing with his back to the door, roughly five (5) to six (6) feet away from him, talking on the telephone.  (Tr. 850).  Banning turned around smiling, and "then all of a sudden, he lost his smile, turned around, ended the conversation [and] came outside."  (Tr. 852).  Rowsey stated that the "first thing" Banning asked him was what he was doing there. (Tr. 852).  When Rowsey offered to help Banning search the woods to find his wife, Banning told him that Officer Kyzer (a nearby neighbor and Henrico police officer) and he had already searched the woods, which was clearly a lie because the petitioner did not make contact with Kyzer until some time later.  (Tr. 853, 859).  Unable to help, Mr. Rowsey returned home and phoned his wife at work between 11:30 a.m. and noon.  (Tr. 836-37).

At noon, Mr. Banning visited Chad Ligon, a neighbor whose property was adjacent to the Banning property. (Tr. 876-77).  Banning told Ligon that his wife was missing, and he had not seen her that morning when he woke up.  (Tr. 878).

Officer Joe Kyzer is a police officer with the Henrico County Police Department and lives a few houses down from the Banning home.  On December 23, 1999, at 12:30 p.m. Mr. Banning appeared at Kyzer's front door. (Tr. 859).  Mr. Banning introduced himself, and told Officer Kyzer that his wife was missing and he had been unable to find her.  (Tr. 860).  He told Kyzer that he had left home at approximately 7:30 a.m. that morning while his wife was still in bed asleep.  (Tr. 860). Banning stated that he received a phone call from Lee at 8:20 a.m. asking him to pick up some Christmas gifts for the kids.  He also mentioned that Lee's van had been moved from its normal spot.  (Tr. 861).

When Kyzer arrived at the Banning residence at approximately 1:00 p.m., he searched the house, and noted that the keys to Lee's van were on the kitchen counter, and her purse was still on the exercise bicycle's seat in the bedroom.  (Tr. 863-64).[3]  Banning informed Officer

---

[3] As the Commonwealth asserted during closing argument, this contradicted Banning's theory that his wife was driving her vehicle

Kyzer that there were some "stray cats" in the area that Lee was concerned about, so it was possible that she might have tried to locate them. (Tr. 864). He admitted, however, that his wife "wouldn't go far into the woods" and that he had only checked his property line to try to locate her. (Tr. 865).

Officer Eric Voncanon, a canine officer with the Henrico County Police Department, arrived at the Banning residence at 2:00 p.m. (Tr. 470, 866). Mr. Banning volunteered that there was a cat in the woods who had recently given birth to kittens, and perhaps it was possible that Mrs. Banning had gone to search for the animals. (Tr. 472). He admitted, however, that Mrs. Banning was not one to wander far into the woods. (Tr. 472). Banning also did not mention to Officer Voncanon who owned the cat. (Tr. 472).

Mr. Banning told Officer Voncanon he had searched for Mrs. Banning around their shed and up to an area where some trees had been knocked down, but he had not gone to "the tree house." (Tr. 473). Banning told Officer Voncanon "at least three or four times" that he had not gone to the tree house. (Tr. 473).

With the help of his canine partner, Officer Voncanon began searching the general area near the tree house. (Tr. 475-78). Officer Kyzer remained in the house with Mr. Banning during this time. (Tr. 867). Shortly thereafter, Officer Voncanon located Lee Banning's lifeless body facedown, almost directly underneath the tree house. (Tr. 478). A small cup of dried cat food was found next to her. (Tr. 493). Officer Voncanon immediately sent out a call alerting other officers that he had a "crime scene." (Tr. 478). Officer Kyzer responded to the radio call and went to help Officer Voncanon until the other officers could arrive. (Tr. 868). Mr. Banning was instructed to remain in the house. (Tr. 868).

Lieutenant Joseph Pajic has served as a Game Warden for the Virginia Department of Game and Inland Fisheries for over fourteen (14) years. (Tr. 1025). He testified that the area where Lee's body was found was "an older forestry area," without a lot of groundcover. (Tr. 1028). He testified that from where the body was found,

when she spotted the supposed cats, particularly when one also considers the icy condition of the windows. It also contradicts Banning's statement that he moved the van when he first arrived at the house to "search" for his wife.

he could see clearly for roughly sixty (60) yards in any direction.    (Tr. 1028).    When he first saw the body, Lieutenant Pajic immediately noted the pellet pattern on the back of Lee's jacket as being caused by a shotgun fired at "a very close distance." (Tr. 1028, 1033).    He also noted that Lee was wearing a denim jacket and red sweatpants, so she would have been easily visible.  (Tr. 1034).    Pajic testified that "there is no way that whoever discharged that firearm would not have known that he was shooting at that woman's body."   (Tr. 1044-45). Because of the circumstances surrounding Lee's death, Lieutenant Pajic did not investigate the scene as a hunting    accident.     (Tr.   1032).     Based   upon   his experience, he judged that the muzzle to target distance was less than thirty (30) feet.   (Tr. 1034).

Detective Kevin Harver is a forensic investigator for the Henrico County Police Department.    (Tr. 502). When he reached the crime scene, he found Mrs. Banning's body beneath the tree house, 695 feet into the woods. (Tr. 510, 670).  There were no drag marks or disturbances in the area around the tree house, nor were there any signs that any hunting had taken place.   (Tr. 514-15). The area where the body was found had very little underbrush and the visibility was very high.   (Tr. 547). When Detective Harver turned the body of Mrs. Banning over, he noticed that there was cat food stuck to her chin and parts of her face.    (Tr. 511).    Harver also learned that the only way to access the tree house was by either entering directly from the Banning property or by climbing a "posted" fence.   (Tr. 522).

During a search of the Banning residence, Detective Harver discovered paper cups and cat food similar to that found next to Lee's body.  (Tr. 524).  During a search of Banning's truck, Detective Harver found a copy of *The Divorce Handbook,* a gray file box filled with assorted papers and photos, and intimate love notes to a woman named "Andrea," who was later identified as Andrea Mowels (a co-worker of the petitioner).   (Tr. 529, 594).

Detective Doug Sullivan responded to the Banning residence at approximately 5:10 p.m. on December 23, 1999.   (Tr. 658).  Detective Sullivan first spoke to Mr. Banning around 6 p.m., and then again around 7:15 p.m. (Tr. 658-59), at which time Sullivan told Banning that his wife was deceased, and that certain things needed to be done; Banning, however, did not even inquire as to how his wife had died.    (Tr. 660-61).    Detective Sullivan testified that Banning "remained calm" upon hearing the news, and Sullivan was surprised at the "lack of emotion

from Mr. Banning" after learning that his wife was dead. (Tr. 666). Detective Sullivan did not explain to Mr. Banning what had killed Lee. (Tr. 661, 717).

Darren Banning told Detective Sullivan that he went to work at Unisource around 9:30 to 10:30 p.m. on December 22, 1999, to send "an important fax" to Mark Stokes in Arkansas. (Tr. 682). It was nearly a thirty (30) mile roundtrip, and he did not arrive home until nearly midnight. Lee was asleep in their bed when he arrived home. (Tr. 682-83). There was, however, no record of a fax ever having been sent on either December 22, or December 23, 1999. (Tr. 742).

Mark Stokes never received the fax from Banning, and on December 29 again requested the information. (Tr. 742). Furthermore, Bill Maslink testified that he sent the information to Mark Stokes on January 3, 2000. (Tr. 742).

Banning's statement to Detective Sullivan was that the victim was asleep at the time he left home at 7:10 a.m. on the morning of December 23. (Tr. 661-62). Banning claimed that at 7:30 a.m. he received a five-minute phone call from his wife on his mobile phone while he was on I-95 northbound at the I-64 split, just past the Boulevard exit. (Tr. 662). According to Banning, he arrived at work between 7:40 and 7:45 a.m. Banning told Sullivan that he received a second call from his wife at 8:45 a.m. while he was on his way to the Virginia Center Commons Mall to do some Christmas shopping but could not connect. He called home, but no one answered so he left a message. (Tr. 662). At approximately 10:30 a.m., Banning stated that he received a phone call from his eldest daughter Sarah telling him that Lee was nowhere to be found. (Tr. 665). Banning had told Richard Thompson that the same call from Sarah took place at around 9:30 a.m. (Tr. 753-54). After calling the dental offices of Dr. Monacell, where Lee worked, and still [being] unable to locate his wife, he claimed that he left work around 11:00 a.m. (Tr. 665).

Despite what he had told Mrs. Rowsey earlier, Banning told Detective Sullivan that he arrived home around 11:30 to 11:35 a.m. (Tr. 663, 835). According to Banning, when he arrived home he noticed that Lee's van was not parked in its normal position in the driveway. (Tr. 666). Rather than look for his missing wife, however, he claimed he went over, unlocked and moved the van to its normal position before entering the house. (Tr. 666-67).

9

Detective Sullivan asked Banning why his wife would venture so far into the woods. (Tr. 670). Banning replied that Lee was "an animal lover" and had recently been looking for a cat and some kittens. Banning added that perhaps his wife had been looking for the cats when she was shot by a hunter in some sort of hunting accident. (Tr. 670). Detective Sullivan testified at trial that this statement "surprised him." At the time of Banning's statement, neither he nor any other member of the police force had ever told Banning that his wife was shot, much less "anything about a hunting accident." (Tr. 670, 868).

After the search on Banning's truck was completed, Detective Sullivan talked to Banning a third time, at approximately 8 p.m. on the evening of the 23rd. When asked who the "Andrea" was in the love letters, Banning told the officer that she was a co-worker he had an intimate relationship with during his separation from his wife in the spring of 1999, but that the affair had ended in July of 1999. (Tr. 678-79).

Eugene Ray Harrison is employed by the Division of Forensic Science and specializes in trace evidence, specifically gunshot residue. (Tr. 1138, 1139). Mr. Harrison found gunshot residue on Lee's left hand. (Tr. 1141). Mr. Harrison concluded that Mrs. Banning was "in close proximity to the discharging weapon." (Tr. 1143). Dr. Deborah Kay, the Assistant Chief Medical Examiner for the Commonwealth, testified that the cause of death was the blast from a shotgun to Mrs. Banning's back. (Tr. 625). Dr. Kay informed the jury that the condition of the body was consistent with a time of death of 7:30 a.m. (Tr. 626). The gun was fired so close that the pattern of the pellet holes measured a mere 3 x 2 ¼ inches on the back of Lee's jacket. (Tr. 623). Such a wound would render a person unable to walk, and death would occur minutes at most after being shot. (Tr. 627).

Richard Goettel is a friend of Banning's. On December 24th Goettel telephoned Banning, and Banning told Goettel that he had told Lee about the cats when she called him at 7:34 the previous morning, and that he was in the area of Interstate-95 when she called. (Tr. 765). Goettel also recalled a phone conversation he had with Banning in the spring of 1998, during which Banning informed him he had met a woman named "Angela," and that the relationship might well "be serious." (Tr. 763-64). Goettel knew that "things were not good at home" between the Bannings. (Tr. 764).

On December 24, 1999, Mr. Banning called William

10

Paul Edwards, a co-worker at Unisource. (Tr. 1248). Edwards had rented a closet in his apartment to Mr. Banning several months earlier. (Tr. 1250-51). Banning called Edwards to tell him his wife had been killed, and that he thought the murder was a hunting accident. (Tr. 1253). At that time, Banning told Mr. Edwards that the police might want to speak to him, and "if they do, what do you think you're going to tell them?" (Tr. 1255). Banning added that it "couldn't have been him [that killed Lee] because he was on his cell phone" at the time she was killed. (Tr. 1255). The very next day, Christmas, Mr. Banning came by and cleaned all of his belongings out of the closet he had rented since August. (Tr. 1251).

At his wife's funeral, Mr. Banning had a conversation with Richard Thompson, during which he told his co-worker, "I really ought not to be talking to you about this, but I was here (at work) at twenty (20) minutes till 8:00 that morning (on December 23, 1999)." (Tr. 756).

On January 1, 2000, nine days after the murder, Detective Nicholas with the Henrico County Police Department found a shotgun wad 63 feet away from the tree house where Lee's body had been found. (Tr. 548).

Though Detective Harver did not find a shotgun or shotgun shells in the Banning home, evidence was presented at trial to prove that Mr. Banning had access to a shotgun. (Tr. 525). Melton Lampkin testified at trial that a few years before Lee's murder, Banning had called him to borrow a pistol because he had a sick goat that needed to be put down and all he had was a shotgun and he didn't want to make a mess. (Tr. 897). Cary Puller, Lee's younger brother, testified that Banning asked to borrow a shotgun in 1981, and that thereafter one of the family's double barreled shotguns was missing from the home. (Tr. 907-926).

James L. Pickleman, qualified as an expert in firearms and tool marks. He testified that the plastic wad discovered by Detective Nicholas was consistent with a 12-gauge shotgun, and the pellets taken from Lee's body were Number 1 buck lead pellets. (Tr. 973). Mr. Pickleman also examined the clothes Mrs. Banning was wearing at the time of her murder and found the markings consistent with what a shotgun blast would be expected to cause. (Tr. 977-78).

Pickleman testified that the greater the muzzle-to-target distance, the larger a shotgun shot pattern got. (Tr. 989). According to Mr. Pickleman, the general rule

11

for shotgun blast patterns is "one inch of pattern spread for each three feet of distance" from the intended target. (Tr. 991). This rule would place the shooter approximately nine feet away from Lee Banning at the time she was shot, and 20 feet or less if the shooter was using a standard shotgun. (Tr. 991-92). Obviously, this repeated evidence of close-range shooting undercut substantially the petitioner's "hunting accident" theory. Though Mr. Pickleman did not have all the information available to him he would have liked to make a concrete "scientific" evaluation of the Banning murder, he estimated that for the shooter to be even thirty (30) feet away from Mrs. Banning when she was shot "would be way beyond what [he] would expect." (Tr. 1017, 1022).

David Wayne Duty has served as the Network Operations Manager of Alltel for the past thirteen years. (Tr. 770-72). Mr. Duty explained that when a mobile phone is on, it locks onto the closest cellular tower where it can receive a signal. (Tr. 773-780). Mr. Duty explained that based upon the location of the cell towers between Mr. Banning's home and his workplace, there was no way that a call could have been received by Mr. Banning at 7:30 a.m. at the intersection of I-64 and I-95 on the morning of his wife's murder. (Tr. 785-86).

Instead, Duty testified that Alltel records showed that Banning's cell received a call at 7:32 a.m. on December 23, 1999, but that call originated and terminated at cell tower 306 — the tower closest to the Banning's home. (Tr. 791-92). Mr. Duty testified that this is "consistent with the defendant picking up his home phone, dialing his cell phone, answering his cell phone, hanging up his cell phone, and then hanging up his home phone." (Tr. 792). The alleged five minute phone conversation with his wife at 7:30 a.m. lasted only forty-six seconds. (Tr. 793). There was no other phone call between 7:32 a.m. and 8:01 a.m. on the morning of December 23, 1999, that lasted for five minutes. (Tr. 794).

Andrea Mowels and Mr. Banning met while both were working for Unisource in January of 1998. (Tr. 1160). Though Andrea knew Banning was married and had a family, the two began having an affair less than a month later. (Tr. 1161). He was not separated from his wife at the time. (Tr. 1161). Banning informed Andrea "he didn't have all that happy of a marriage." (Tr. 1161). Beginning in March of 1998, Mr. Banning began to become more and more involved with Ms. Mowels. (Tr. 1162, 1189-1201). Banning was "very generous" and was "always very

12

clear that he loved Ms. Mowels. (Tr. 1166, 1240). The two took many trips together and Mr. Banning gave Ms. Mowels numerous expensive gifts, including designer jewelry, clothing, shoes and lingerie, a very valuable Boyd's Bear Collection, a television, and even a computer. (Tr. 1189-1201).

From February until September, 1999, Mr. Banning lived separately from his wife. (Tr. 1173). During the separation he stayed at various hotels. (Tr. 1173). Despite moving back home towards the end of September 1999, Mr. Banning continued his "very open and passionate" relationship with Ms. Mowels. (Tr. 1163, 1173). The couple's relationship did not finally end until February of 2002, over two years after his wife's murder. (Tr. 1184).

As of January 1998, the Banning's only joint family debt was a $139,586.00 mortgage on their home and a small truck loan for Mr. Banning's pickup. (Tr. 1267-1272). They were in the process of paying off all their debt and credit cards. (Tr. 1270-72). All the bills came to the Banning residential address at 7700 Harewood Lane and were paid through the couple's joint Wachovia Bank account. (Tr. 1270-72). Lee was a highly conscientious bookkeeper, tallying the checking account every month "down to the penny." (Tr. 1279).

As of January 1998, Mr. Banning had no personal debt. The month Mr. Banning began his affair with Ms. Mowels, however, he opened a Citibank charge card account in his own name to pay for the expenses related to the affair — restaurants, cash advances, and department store purchases. (Tr. 1289). The bills were sent to his work. (Tr. 1290). One month later, he opened a First Union Bank checking account and an MBNA credit card to pay off the Citibank card. (Tr. 1290-91). Banning also opened accounts at Kohls, Lemers, and Victoria Secret. (Tr. 1292-94). The contact information for all these accounts, like his credit cards and bank accounts, all went to places other than his home address. (Tr. 1292-94). Any extra income Mr. Banning received no longer went into his joint account at Wachovia. Instead, Banning used this extra income to pay down his cards and for cash advances. (Tr. 1311-1315). Mr. Banning accumulated so much debt that his minimum monthly payment was over $1600.00 a month, and he was almost always late making his payments. (Tr. 1298). He was close to the limit on almost all of his credit cards. (Tr. 1298). On the day of Lee's murder, Darren Banning personally owed

$42,915.56. (Tr. 1298). In calendar years 1998 and 1999 his take home pay totaled only $73,778. (Tr. 1300).

After Lee was killed, the separate accounts were closed and the formerly joint Wachovia account was then used to pay Mr. Banning's bills. (Tr. 1298). Unlike his previous paychecks, which had been split between his own First Union account and the Wachovia account, all of his paychecks after Mrs. Banning's death went into the Wachovia account. (Tr. 1315).

On December 21, 1999, two days before Lee's murder, Banning wrote a $5,000.00 check for cash on the couple's Wheat First Securities Account. (Tr. 1327-29). Up until that point, the maximum amount drawn from the account was $2,500.00, and was always deposited directly into the couple's joint account to pay their bills. (Tr. 1325). On December 28, 1999, Banning called Rebecca Robertson, who managed the Wheat First Account, to tell her that Mrs. Banning, not Mr. Banning, had written the check but had been unable to call the bank to have them sell the securities before she died. (Tr. 1360-62).

At the time of her murder, Lee had life insurance policies totaling $330,000.000 (Tr. 1318). Coupled with the Wheat First Securities account and the King William property left to Mr. and Mrs. Banning by Lee's mother, Banning stood to inherit $501,721.03. (Tr. 1316-1324).

On December 23, 1999, at 10:10 a.m., several hours before Lee's body was discovered (and less than three hours after her murder), Mr. Banning purchased jewelry for Andrea Mowels, not from one of the secret accounts he had always used for such purchases, but from the Banning's joint Wachovia account. (Tr. 1378-1387). This was the same account that Lee balanced to the penny every month. Had she lived, she would have received that Wachovia statement, and learned of the jewelry purchase, on January 5, 2000. (Tr. 1386).

On December 23, 2002, Sgt. Englehart and Mrs. Hottinger revisited the location where each had hunted on the morning of Lee's murder. (Tr. 443). Detective Harver stood beneath the tree house under which Lee Banning had been killed and fired three (3) shots from a twelve gauge shotgun. (Tr. 444, 462). Both Sgt. Englehart and Mrs. Hottinger testified that the shots were of the same sound and tenor, from the same direction, and sounded as if they came from the same distance as the shot that killed Lee Banning in 1999. (Tr. 444, 462).

14

Banning v. Johnson, No. CL06-2474, 2-17 (Va. Cir. Ct. Feb. 13, 2008)(hereinafter "State Habeas Op.") (emphasis omitted; minor typographical errors corrected).  The foregoing findings of fact are presumed correct and binding upon this Court absent clear and convincing evidence to the contrary.  See 28 U.S.C. § 2254(e)(1); Fisher v. Lee, 215 F.3d 438, 445-46 (4th Cir. 2000).

## IV.   INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate the ineffective assistance of counsel, a defendant must show first that counsel's representation was deficient and then that the deficient performance prejudiced the defense.   Strickland v. Washington, 466 U.S. 668, 687 (1984). Satisfying the deficient performance facet of Strickland requires the defendant to overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'"   Burch v. Corcoran, 273 F.3d 577, 588 (4th Cir. 2001) (quoting Strickland, 466 U.S. at 689).   The prejudice component requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."   Strickland, 466 U.S. at 694. Furthermore, in analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel's performance was

deficient if the claim is readily dismissed for lack of prejudice. Id. at 697.

### A. Testimony By Detective Sullivan and Lieutenant Pajic - Claim A

In Claim A Banning faults counsel for failing to object to testimony from Detective Sullivan and Lieutenant Pajic that they were able "'to rule out' a hunting accident as possible cause for Lee Banning's death." (§ 2254 Pet. ¶ 35.)

#### 1. Detective Sullivan

Before hearing the foregoing purportedly objectionable testimony from Detective Sullivan, the jury had heard Detective Sullivan's lengthy account of his investigation. During that testimony, Detective Sullivan recounted Banning's lack of reaction when he was informed that his wife had not been killed in a hunting accident, but had been murdered by a shotgun blast from very short range. At the conclusion of his testimony, the following exchange occurred:

| PROSECUTOR: | Did you . . . have occasion to consider the possibility of a hunting accident? |
|---|---|
| SULLIVAN: | Yes, sir, I had. |
| PROSECUTOR: | Did you have occasion to reject that possibility? |
| SULLIVAN: | Uh, yes, I had. |

(Tr. 699.) Sullivan then explained the foregoing determination had been made after talking to people involved in the investigation, "all the evidence here." (Tr. 699-700.) Sullivan also acknowledged

16

that he had "talked to people that will not come before the jury, other hunters and people in that area." (Tr. 700.)   Detective Sullivan was not declared an expert.

In rejecting the part of Claim A respecting Detective Sullivan's testimony, the Circuit Court found it unnecessary to address whether the testimony was objectionable.   Instead, the Circuit Court concluded that, considering the testimony before the jury, counsel's failure to object was not deficient because:

> as counsel states in his affidavit, "the fact that [the petitioner] was on trial for murder demonstrated that Detective Sullivan had excluded the possibility, in his mind, that [the victim] was killed in a hunting accident."   Counsel further then correctly states "whether I had objected to his testimony or not, the jury was aware from the fact that [the petitioner] was charged with first degree murder that Detective Sullivan did not believe that the hunting accident killed [the victim]."   Counsel's decision to forego an objection on this basis fell within the "wide range of reasonable professional assistance" required of defense counsel.   It is clear from counsel's cross-examination of Sullivan that he vigorously attacked Sullivan's conclusions . . . .   [C]ounsel was not ineffective for pursuing such an attack on the weight of testimony . . . ., instead of attacking its admissibility.

State Habeas Op. 19-20 (alterations in original) (citing Grier v. Georgia, 541 S.E.2d 369 (Ga. 2001)).   Considering the deference owed to counsel's tactical choices, Banning fails to demonstrate that the Virginia court's rejection of this claim was objectively unreasonable.   See Humphries v. Ozmint, 397 F.3d 206, 234-35 (4th Cir. 2005); 28 U.S.C. § 2254(d)(1).   Accordingly, the part of

17

Claim A that involved Detective Sullivan's testimony will be DISMISSED.

### 2. Lieutenant Pajic

Unlike Detective Sullivan, Lt. Pajic was qualified as an expert in the investigation of hunting accidents. (Tr. 1032.) Banning complains that Lt. Pajic impermissibly testified that: (1) in the area of the murder, the trees were mature, the vegetation was limited, visibility was good, and with the 60 yards of visibility the area would not provide a good spot for hunting deer; (2) "there is no question in my mind that the person who, who discharged that firearm would have had to have identified the target" (Tr. 1042); and, (3) "in my view, there's no way that whoever discharged that firearm would not have known that he was shooting at that woman's body." (Tr. 1044-45).[4]

---

[4] Banning also complains about Lt. Pajic's opinion that the victim was shot from close range. (§ 2254 Pet. ¶ 43.) Counsel objected to this testimony and his objection was overruled. Banning fails to suggest how counsel's conduct with respect to that comment was deficient or prejudicial, and thus fails to state a claim for relief respecting that opinion.

Banning also contends that counsel should have objected to Lt. Pajic's testimony about the differences between Lee's clothing and the clothing normally worn by hunters. Counsel reasonably declined to object because testimony on this subject permitted counsel, on cross-examination, to contrast Lee's dull-colored, nondescript clothing to the orange safety vests worn by most hunters. This evidence bolstered the theory the Lee's death was a hunting accident.

18

Banning's legal contentions as to why the foregoing comments were improper are not particularly lucid.[5]   (§ 2254 Pet. ¶ 48.) Banning fails to demonstrate that the first comment invaded the province of the jury or was improper for any of the other reasons he urges here.   Thus, he fails to demonstrate deficiency on the part of counsel with respect to that comment.

Banning also fails to demonstrate that counsel's failure to object to Lt. Pajic's other comments rose to the level of constitutionally deficient performance.   Virginia courts "consistently have held that the admission of expert opinion upon an ultimate issue of fact in a criminal case is impermissible because it invades the province of the jury." Velazquez v. Commonwealth, 557 S.E.2d 213, 219 (Va. 2002) (citing cases).   In Velazquez, the Supreme Court of Virginia held that, where the only

---

[5] Banning contends:

In no particular order, the "expert" testimony from Lt. Pajic . . . as described herein was inadmissible for the following reasons: (1) the testimony invades the province of the jury; (2) it was a question of fact whether the death was caused by a hunting accident or a murder, which is the ultimate issue of fact; (3) inferences to be drawn from observations of the scene are solely within the province of the jury; (4) the testimony was based upon statements (and opinions) from others whose credibility fall squarely within the jury's province; (5) the opinions were based on facts neither in evidence nor admissible; (6) there were too many variables, unknown, assumed, or not considered; (7) the opinions were not reliable or scientific; and, (8) said opinions were improperly phrased or stated.

(§ 2254 Pet. ¶ 48.)

issue at trial was consent, an expert's testimony that the victim's injuries were both "inconsistent with consensual intercourse" and "consistent with non-consensual intercourse . . . clearly expressed her opinion that [the victim] was raped because her opinion excluded all other trauma as the source of [her] injuries." Id. Unlike the expert in Velazquez, Lt. Pajic's testimony did not pertain to "the precise and ultimate issue in the case." Id.; see also Ramsey v. Commonwealth, 200 Va. 249, 251 (1958) (remanding for new trial where, in trial on arson charges, expert testified that fire was of incendiary origin, and "the form of the question and the answer to it unquestionably point[ed to the defendant] as the guilty agent," invading province of the jury). Lt. Pajic merely stated that Banning's alternative theory was not possible; he did not place the impriamtur of his expert opinion on any fact necessary for a finding of guilt. See Bond v. Commonwealth, 226 Va. 534, 537-38 (Va. 1984) (reversing conviction for murder based on expert's testimony that victim's death due to falling was a homicide caused by being pushed because ultimate fact at issue was whether death occurred due to "criminal agency"). It is far from clear that Lt. Pajic's testimony was inadmissible on the grounds Banning urges. Against this uncertainty must be weighed the danger of highlighting the facts underlying Lt. Pajic's opinion and his ultimate conclusion that Lee's death was inconsistent with a hunting accident. See

20

Humphries, 297 F.3d at 234-35. Eschewing an objection to Lt. Pajic's testimony does not constitute deficient performance.

Moreover, Banning cannot demonstrate prejudice. The record does not indicate any substantial likelihood that, absent Lt. Pajic's testimony, the jury would have accepted Banning's hunting accident theory. Banning's theory was simply not well supported by any facts. This likelihood is even more pronounced when viewed in the context of the record as a whole, including the other adverse testimony. To paraphrase the Circuit Court, while no single piece of evidence demonstrated Banning murdered his wife, the combined force of the many concurrent and circumstances introduced by the prosecution lead irresistibly toward that conclusion. State Habeas Op. at 19 n.4 (quoting Stamper v. Commonwealth, 257 S.E.2d 808, 818 (Va. 1979)). With respect to Banning's complaints about Lt. Pajic's second and third comments, there is no reasonable probability that the result would have been different if these snippets of opinion had been excluded. Absent such comments, the admissible evidence regarding the extremely short range of the fatal shot and good visibility at the time and location of shooting foreclosed any reasonable possibility that Lee was mistakenly shot by a deer hunter. Accordingly, Claim A will be DISMISSED because Banning has not demonstrated deficiency and prejudice.

21

### B.   Failure To Call Sarah Banning - Claim B

In Claim B, Banning faults counsel for not calling his daughter Sarah to testify.   In response to this claim in the Circuit Court, Respondent tendered the affidavit of Banning's trial counsel, Christopher Booberg.   In that affidavit, Mr. Booberg stated that he had interviewed Sarah Banning before trial and was aware of the testimony that she had to offer.   Mr. Booberg further stated,

> [F]ollowing the close of the evidence by the Commonwealth, the Judge dismissed the jury and ended the trial for the day.   During the evening recess, Mr. Banning and I spoke about how we would proceed.   Mr. Banning and I both decided that, as a matter of trial strategy, we would not put on any evidence.

(State Habeas Record, Respt.'s Mot. to Dismiss Ex. 2, ¶ 2.)   The Circuit Court concluded that the failure to call Sarah Banning was not deficient.   State Habeas Op. at 22 ("[Sarah] was a risky witness because the jury may have found her testimony incredible due to bias.  Moreover, this Court finds . . . the decision not to call Sarah Banning is the quintessential type of tactical decision which this Court should not second guess generally.").

Banning asserts that the Court should discount counsel's affidavit and the state habeas ruling because counsel is incorrect about the timing of any discussion about presenting a defense and asserts that "the record of this matter refutes any claim by counsel that he had a detailed discussion during the evening recess after the Commonwealth rested."   (Petr.'s Resp. to Motion to

22

Dismiss ¶ 27.)  In support of this assertion, Banning notes that
the Commonwealth rested during the morning hours of August 1, 2003,
and the Court charged the jury later same day.  (Tr.  1443.)
Although Banning is correct that the Commonwealth rested on August
1, 2003, the record reflects that the Commonwealth  "r[a]n out of
witnesses", the day before on July 31, 2003.   (Tr. 1389.)   The
witnesses called on August 1, 2003, were called by the Commonwealth
at the request of the defense in order to remedy a belated
disclosure of information by the prosecution.  (Tr. 1230,  1395.)
The witnesses were then subject to recross-examination by the
defense.   In light of these circumstances, counsel's lack of
precision about when the decision to present evidence occurred does
not provide a substantial basis for discounting the decision itself
or the subsequent ruling of the state habeas courts.

     Indeed, the unusual denouement of prosecution's case described
above was a significant boon to the defense and supports the
reasonableness of counsel's decision to rest.   Specifically,
instead of the prosecution's case concluding with the damning
evidence of Banning's finances, it ended with string of witnesses
hand chosen by the defense.  As discussed below, considering the
vigorous challenge mounted to the sufficiency of the evidence, it
was reasonable for counsel to conclude that Banning was best served
by leaving the jury to mull over any doubts lingering at the end of
the prosecution's case, rather than present a tepid defense case

that would be subject to potentially withering cross-examination and would permit additional rebuttal evidence.    See Turner v. Williams, 35 F.3d 872, 901-03 (4th Cir. 1995), overruled in part on other grounds by O'Dell v. Netherland, 95 F.3d 1214, 1222 (4th Cir. 1996) (en banc); see also Wilson v. Ozmint, 352 F.3d 847, 862-63 (4th Cir. 2003).    Contrary to Banning's suggestion, there were significant risks associated with calling the weak witnesses and pursuing some of the implausible arguments that he urges in his federal habeas petition. It is "[a] fundamental reality of trial practice is that '[o]ften, a weak witness or argument is not merely useless but, worse than that, may detract from the strength of the case by distracting from stronger arguments and focusing attention on weaknesses.'" United States v. Terry, 366 F.3d 312, 318 (4th Cir. 2004) (alteration in original) (quoting Epsom v. Hall, 330 F.3d 49, 53 (1st Cir. 2003)).    This principle applies with particular force to Sarah Banning.

Although Banning suggests that Sarah Banning would have been a particularly compelling witness, it is apparent that her testimony would have been significantly diminished by her evident lack of objectivity.    Further, Sarah Banning's testimony would offer the prosecution a host of additional opportunities to highlight Banning's lies and his indifference to his wife's fate. For example, Sarah Banning's assertion that her parent's marriage was not unhappy, was hardly likely to counteract the abundant

evidence of Banning's philandering and his evident desire to get a divorce.[6]  Banning persists that his daughter's testimony could have altered the impression that he wanted his wife dead and he was unmoved by her death.  On the latter point, she has said that "I saw my father grieve for my mother . . . . I had never seen him cry before she died but he cried after she had died.  Also, I know that he was so distraught that he did not eat for days." (§ 2254 Pet. Ex. 1, ¶ 8.)  Any testimony from Sarah Banning about her father's grieving would have opened the door for prosecution to present additional damaging evidence about Banning's ambivalence about his wife's death.  For example, although Banning spent ten of thousands of dollars in various frivolous expenses in the two years following his wife's death, including over $700.00 for a tanning contract, (Tr. 1335-36), Banning had not troubled to purchase a gravestone for her grave.  (Sentencing Tr. 26.)

Banning also contends that Sarah Banning could have countered Mr. Rowsey's testimony that, when he arrived at the Banning residence, he observed Banning smiling and talking on the telephone.  She would have said that she was "certain that he was not on the telephone in the kitchen laughing and smiling with anyone." (§ 2254 Pet. Ex. 1, ¶ 10.)  That testimony was unlikely to have swayed the jury because she also would have had to answer

---

[6] She also stated that she was unaware that her parents had been separated for six months in 1998.

whether she was aware that, according to phone records, her father had called his girlfriend, Ms. Mowels, at 12:43 p.m. (Tr. 799, 800.) Thus, allowing the daughter to testify likely would have been more harmful than beneficial.

Banning advances other facts to which Sarah Banning could have testified, specifically:  that her mother's van had moved from where it was parked before the night before the murder; there was no ice on the windows of her mother's van; she had not observed any shotguns or other modern weapons in her parent's house; that hunting did occur around their home; and she "would often hear gun shots during hunting season, and I have found used shotgun shells in areas behind our house."  (§ 2254 Pet. Ex. 1, ¶ 9.)

Sarah Banning's testimony on any of these points, however, would have damaged Banning's defense.   First, as noted by the Circuit Court, the defense theory that Lee Banning was starting to pull the car out the driveway to go to work when she noticed kittens was never particularly plausible.   While she might have been lured to the tree house by kittens or tales of kittens from her husband, her clothing was entirely inconsistent with her required work attire.   Second, the value of Sarah Banning's testimony about guns and hunting would have to be weighed against both the credibility problems discussed above and the additional opportunities it would have provided the prosecution to highlight Banning's culpable behavior and his lies to the police.   For

26

example, the record indicates that Sarah Banning called her father shortly after 9:30 a.m. to inform him that their mother was missing.[7] (Tr. 753, 829.) According to her, Banning said "that he was on his way home and that my sister and I should not worry." (§ 2254 Pet. Ex. 1, ¶ 5.) Notwithstanding receiving this disturbing news, Banning did not go right home. Rather, at 10:02 a.m., Banning called his mistress, Andrea Mowels. Thereafter, at 10:10 a.m., Banning went shopping and purchased an expensive necklace for Ms. Mowels. In light of the potential harm to the defense and the marginal benefits of her testimony, counsel reasonably declined to call Sarah Banning as a witness. Claim B will be DISMISSED.

### C. Failure to Call Mr. and Mrs. Royal - Claim C
### Inadequate Impeachment of Mr. Englehart - Claim D(3)

Banning faults counsel for not calling his next door neighbors, the Royals, to testify for the defense. Banning notes first that the Royals could testify that, on December 23, 1999, it had been foggy. However, counsel was able to elicit information about the fog and visibility from numerous other witnesses. His decision not to pursue cumulative evidence with respect to visibility from the Royals was not deficient. See Bacon v. Lee, 225 F.2d 470, 481-82 (4th Cir. 2000).

---

[7] Banning told Detective Sullivan that his daughter had called him at 10:30 a.m. (Tr. 665.) Banning told Richard Thompson that the same called had taken place around 9:30 a.m. (Tr. 753-54.)

Banning also argues that counsel should have called the Royals to testify that they did not hear a shot on the morning of the murder. Mrs. Royal left for work around 7:15 a.m. and Mr. Royal left the home to run errands around 7:30 a.m.; and neither Mr. nor Mrs. Royal heard gunshots or anything unusual before leaving the house. Banning persists that, in light of the record of his phone calls, it was essential for the defense to present evidence suggesting that the shooting had occurred after 7:30 a.m. Mrs. Royal had already left for work by 7:15, thus she would not be helpful to the defense on this issue. Mr. Royal's testimony was potentially useful, but he only could say that he did not hear a shot before he left his house "around 7:30 a.m." (§ 2254 Pet. Ex. 2.) Counsel reasonably perceived that this ambiguity rendered Mr. Royal's testimony ultimately useless or even harmful to the defense.[8]

In contrast to Mr. Royal's indefinite recollection of when he left the house, the prosecution offered compelling, credible testimony that the fatal shot occurred at precisely 7:30 a.m. Specifically, Sgt. Englehart testified that he looked at his beeper when he heard the shot. (Tr. 434.) Counsel perceived Sgt. Englehart as "a sympathetic witness who appeared to be telling the

---

[8] Trial counsel also represents that he was wary of calling Mr. Royal because, during the course of the defense investigation, Mr. Royal had become "angry and uncooperative with the defense." (Respt.'s Mot. to Dismiss State Habeas Ex. 2, ¶ 5.)

truth as well as he could remember it and who made a good connection with the jury." (Respt.'s Motion to Dismiss State Habeas Pet. Ex. 2 ¶ 8.) Considering the foregoing circumstances, counsel reasonably decided not to belabor the issue of visibility or to attempt to challenge Sgt. Englehart's recollection of events with Mr. Royal's indefinite testimony about when he left the house. Terry, 366 F.3d at 318 (quoting Epsom, 330 F.3d at 53). Accordingly, Claim C will be DISMISSED because Banning has failed to demonstrate deficiency on the part of counsel.

Banning notes that there was substantial delay between his wife's death and when Sgt. Englehart came forward and stated that he had heard a shot 7:30 a.m. In Claim D(3), Banning faults counsel for not confronting Sgt. Englehart with this information on cross-examination so as to suggest that Sgt. Englehart's testimony was fabricated to facilitate a conviction.[9] Counsel reasonably eschewed such a tactic in light of his perception of Sgt. Englehart's veracity and connection with the jury. Therefore, instead of attacking Sgt. Englehart's credibility, he attempted to minimize the impact of his testimony by eliciting information helpful to the defense on cross-examination, such as the fact that

---

[9] Banning also represents that a substantial period of time elapsed before the police interviewed Sandra Hottinger and learned that she had heard a shotgun blast between 7:30 and 8:00 a.m. on the morning of Lee's death. Considering the precision of Sgt. Englehart's credible testimony, Banning fails to demonstrate that counsel was deficient or that he was prejudiced by the lack of cross-examination on this subject.

deer are in general area of the Banning residence and that some hunters use tree stands, which are similar to the tree house where Lee Banning was shot. Accordingly, Claim D(3) will be DISMISSED because Banning has failed to demonstrate deficiency on the part of counsel.

### D. Miscellaneous Claims of Ineffective Assistance of Counsel

In Claim D(1), Banning faults counsel for failing to call a witness to testify that, shortly after Lee's death, numerous hunters were observed at a convenience store near the Banning home drinking what appeared to be alcoholic beverages out of paper bags. Considering the compelling evidence of Banning's guilt, there is no reasonable possibility that evidence of hunting near the crime scene or of hunters drinking while hunting would have altered the verdict. Claim D(1) will be DISMISSED.

In Claim D(2), Banning faults counsel's cross-examination of Richard Thurston. Mr. Thurston apparently had dated Ms. Mowels before her affair with Banning. When counsel asked Mr. Thurston when his affair with her had ended, the prosecutor objected on the grounds of relevance and the Circuit Court sustained the objection. Banning contends that counsel should have persisted that the question was relevant to Mr. Thurston's bias. Nevertheless, later in the trial, Mr. Thurston readily admitted "Yeah, I just don't like him, because, you know, work-related stuff." (Tr. 1410-11.) Specifically, Mr. Thurston stated that Banning "puts a lot of work

30

on everybody" and thought he was better than his co-workers.  (Tr. 1411.)  Considering the minimal significance of Mr. Thurston's testimony and counsel's successful efforts to have Mr. Thurston admit his bias, counsel's failure to pursue the question Banning urges here was neither deficient nor prejudicial.  Claim D(2) will be DISMISSED.

In Claim D(4), Banning faults counsel for not objecting to the experimentation evidence described during the testimony of Sgt. Englehart and Sandra Hottinger.  The Circuit Court ruled as follows with respect to this claim:

> These witnesses testified that at some time subsequent to the actual events, they conducted experiments in the woods under police supervision in which they attempted to re-create the relevant distances from which they heard the shot at 7:30 a.m. on the morning when the victim was killed. Both witnesses testified that the type of sound was consistent in terms of magnitude, etc. with that they heard on the day of the shooting.  Again, counsel notes in his state court affidavit that he objected to the admissibility of this testimony on another ground (the Commonwealth's failure to disclose it to the defense.) His apparent conclusion that any flaws in the evidence went to its weight . . ., not its admissibility, is a reasonable one which is entitled to deference during this habeas corpus action.  Moreover, in light of the other significant evidence of the petitioner's guilt, the petitioner has shown no prejudice (this was far from the most damning evidence in the case).

State Habeas Op. at 28.  The Circuit Court correctly assessed counsel's performance and the lack of prejudice to the defense. Cf. Brown v. Corbin, 423 S.E.2d 176, 178 (Va. 1992) (concluding that a photographic reconstruction of an event "is in the nature of a test or experiment" and is admissible if the party offering

31

the evidence establishes that the reconstruction "is substantially similar, although not necessarily identical, to the actual event in all of its essential particulars" (citing Habers v. Madison, 193 S.E.2d 653, 655 (Va. 1973))). Accordingly, Claim D(4) will be DISMISSED.

In Claim D(5), Banning faults counsel because he failed to call, "Dr. Jack Daniels and any other similarly qualified pathologist [who] could have testified as to the other helpful observations . . . that could greatly assist in calculating the time of death." (§ 2254 Pet. ¶ 115.) Banning then points out that the investigating officer omitted to record data that might have aided in this calculation, such as the ambient air temperature, body temperature, rigor mortis, liver mortis or postmortem lividity. (§ 2254 Pet. ¶ 115.) In perspective of those omissions, it was, says Banning, ineffective for counsel not to have called Dr. Daniels or a similar expert witness. "However, as counsel notes (and the petitioner concedes) counsel did present evidence that the forensic technician failed to take the temperature of the victim's body. The technician admitted that he should have taken her temperature and stated that he started carrying a thermometer with him after this case." State Habeas Op. at 28-29 (internal quotation marks omitted). Thus, these omissions were directed to the jury's attention. But, Banning has not submitted evidence from Dr. Daniels or any other pathologist

32

that would place the time of death after 7:30 a.m. In light of counsel's effective cross-examination and Banning's failure to demonstrate how additional forensic evidence would have aided the defense, Banning has failed to demonstrate deficiency or prejudice. Claim D(5) will be DISMISSED.

In Claim D(6), Banning faults counsel for failing to request a jury instruction that it was not necessary for the defense to prove beyond a reasonable doubt that Lee Banning was killed as a result of a hunting accident, but simply present evidence sufficient to raise a reasonable doubt that Banning intentionally killed his wife. This argument, of course, is faulty because the defense had no burden to prove anything. Moreover, the jury was properly instructed that the prosecution had the burden to prove Banning's guilt beyond a reasonable doubt and that "[t]here is no burden on the defendant to produce any evidence." (Tr. 1488.) "[C]ounsel is not ineffective for failing to offer alternatives to proper jury instructions." Bennett v. Angelone, 92 F.3d 1336, 1350 (4th Cir. 1996) (citing Pruett v. Thompson, 996 F.2d 1560, 1577 (4th Cir. 1993)). Claim D(6) will be DISMISSED.

### E. Failure to Suggest that Lee Banning was Shot by Someone Standing in the Tree house - Claim E

In Claim E, Banning faults counsel for failing to present evidence and argument to suggest a hunter accidentally shot Lee Banning through the narrow spaces between the floor boards of the tree house. As explained in his affidavit, defense counsel

33

thoroughly explored and then rejected the possibility of presenting this theory:

> Prior to trial, I inspected the Ligon tree house along with J.R. Long, the private investigator who assisted me and assisted Mr. Banning's current counsel. Mr. Long and I entered the tree house and attempted to determine whether or not it seemed reasonable to believe that someone hunting from the tree house had killed Mrs. Banning. I am not a hunter and I relied on Mr. Long's considerable experience in hunting regarding whether or not a hunter would have hunted from the tree house and could have accidentally killed Mrs. Banning. Mr. Long and I both believed that any hunting from the tree house would result in shotgun pellets entering the ground. We searched the ground underneath the tree house with a metal detector. We discovered many rusty nails in the ground, but did not discover any shotgun pellets. Mr. Long opined that he did not believe the tree house was a deer hunting stand and did not believe it had been used by hunters.
>
> Mr. Banning now alleges that I should have argued his new theory . . . that Mrs. Banning was shot by a hunter who had placed the barrel [of the shotgun] partially protruding through the boards of the deck. . . . Mr. Banning's theory is inconsistent with anyone hunting for deer. . . . [A] person in the tree house would have an extremely obstructed view due both to the boards of the deck and the []very foggy conditions. This is exactly why Mr. Long and I excluded such a theory from the realm of possibility. Mr. Long and I agreed that the theory put forth by Mr. Banning is not consistent with a recreational hunter hunting deer. . . . No hunter would hunt this way because it would not be possible for him to identify his target prior to firing. . . . Mr. Long and I both decided that shooting through the floor of the tree house was inconsistent with hunting for deer and was consistent with attempting to kill someone and therefore decided not to argue that theory.

(State Habeas Record Respt.'s Mot. to Dismiss, Ex. 2, ¶ 11 (internal quotation marks omitted.)) Counsel's decision not to pursue the preposterous theory urged by Banning was eminently reasonable. See Strickland, 466 U.S. at 690 (emphasizing that

"strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Indeed, as noted by the Circuit Court, pursuit of this theory could only have supported the prosecution's assertion that Lee Banning had been ambushed. State Habeas Op. at 30. Claim E will be DISMISSED.

   **F.  Cumulative Effects of Alleged Errors by Counsel - Claim F**

   Finally, in Claim F, Banning contends that, when considered cumulatively, he was denied the effective assistance of counsel. The cumulative analysis that Banning advances is not permitted here for any claim as to which the Court concluded that counsel was not deficient. See Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998). "[A]ttorney acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" Id. at 853 (quoting Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996)). Considering the claims that were dismissed solely on the basis of a lack of prejudice - the two comments by Lt. Pajic in Claim A and D(1) - the Court concludes that, even when considered cumulatively, Banning has not demonstrated a reasonable probability of a different result. Accordingly, Claim F will be DISMISSED.

The motion to dismiss (Docket No. 5) will be GRANTED. The petition for a writ of habeas corpus will be DENIED and the action will be DISMISSED WITH PREJUDICE.

The Clerk is directed to send a copy of the Memorandum Opinion to Banning and counsel of record.

And it is so ORDERED.

_____/s/_____   _REP_

Robert E. Payne
Senior United States District Judge

Date: _September 30, 2009_
Richmond, Virginia

36